IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| JEFFERY MULLINS, | § | |
| *Plaintiff,* | § | |
| | § | |
| vs. | § | 5-21-CV-01292-FB-RBF |
| | § | |
| MEDINA COUNTY, TEXAS,[1] | § | |
| *Defendant.* | § | |
| | § | |

### REPORT AND RECOMMENDATION
### OF UNITED STATES MAGISTRATE JUDGE

**To the Honorable United States District Judge Fred Biery:**

This Report and Recommendation concerns Defendant Medina County's Motion for Summary Judgment. *See* Dkt. No. 67. The District Court referred all pretrial matters in this action for resolution, pursuant to Rules CV-72 and 1 of Appendix C to the Local Rules for the United States District Court for the Western District of Texas. *See* Dkt. No. 8. Authority to enter this recommendation stems from 28 U.S.C. § 636(b)(1)(B). For the reasons set forth below, Defendant's Motion for Summary Judgment, Dkt. No. 67, should be **DENIED**.

### Factual and Procedural Background

On the afternoon of December 31, 2019,[2] Medina County Deputy Sheriff Wesley Williams responded to a suicide outcry call at Plaintiff Jeffrey Mullins' home. Dkt. No. 42 (live

---

[1] The District Court dismissed the excessive force claim against Deputy Williams on qualified-immunity grounds. *See* Dkt. Nos. 54 & 64. The only remaining claims are against Medina County. The Clerk of Court is directed to remove Deputy Wesley Williams from the case caption and change the case's style to reflect the properly named defendant as set out in the style used for this Report and Recommendation.

complaint) at ¶ 14; *see also* Dkt. No. 11-2 (Deputy Williams' incident report). Arriving on scene, Deputy Williams observed Plaintiff Mullins and his fiancé, now wife, Shannon Smith standing outside a gate to the property; Smith had a strong odor of alcohol about her person. Dkt. Nos. 42 at ¶ 14 & 11-2 at 3. Mullins informed Deputy Williams that Smith had been drinking and that she had made the outcry. Dkt. Nos. 42 at ¶ 15, 11-2 at 2, 46-1 at 3:12-18 (transcript of body camera footage). Deputy Williams then separated Smith and Mullins. *See* Dkt. Nos. 11-2 at 2 & 46-1 4:1-4. Smith informed the deputy that she was "extremely upset." Dkt. No. 46-1 at 3:20. When asked by Deputy Williams about Smith's access to weapons, Mullins informed the deputy that "everything's locked up." *Id*. at 4:22-5:4.

But the situation began to escalate when Deputy Williams asked Mullins for his driver's license "to go in the report." *Id*. at 5:8-11. Mullins refused, saying "Nah, you don't need mine. [Smith] called you." *Id*. at 5:8-13. Deputy Williams again asked, this time informing Mullins that he "had the right to identify all persons on a location that [he] had been called to in the commission of [his] duties." Dkt. No. 11-2 at 3. Mullins again refused to provide his identification. Dkt. Nos. 46-1 at 5:14-18; 11-2 at 3. Deputy Williams then turned to Smith and asked her what Mullins' relationship was to her and for Mullins' name. Dkt. Nos. 11-2 * 46-1 at 5:20. Smith responded, "He's my fiancé," but before she could provide Mullins' name, Mullins interjected, saying, "Babe, he doesn't need to know anything about me." Smith then responded to Deputy Williams "it's not pertinent information." *Id*. at 5:20-6:2.

According to Deputy Williams's report, Mullins' interjection raised his suspicions because he had "seen domestic violence situations play out in the same way, with the abuser

---

[2] As noted in the Court's prior Report and Recommendation, Plaintiff's First Amended Complaint at one point refers to the event occurring on December 31, 2021. *See* Dkt. Nos. 54 & 42 at 1. The Court views this as a scrivener's error because this action was filed on December 29, 2021.

controlling the victim either verbally or physically." Dkt. No. 11-2 at 3. At this point, Deputy Williams approached Mullins, telling Mullins that he had a "a right to identify anybody on location if [he] receive[d] a 911 call . . . to a residence." Dkt. No. 46-1 at 6:3-5.

After this escalation, Mullins turned and started walking away, at which point Deputy Williams said, "Nope, stop, you're being detained." Dkt. Nos. 5-1 (Deputy Williams' bodycam footage) at 03:19 & 46-1 at 6:7-11. Deputy Williams then grabbed Mullins' wrist;[3] Mullins stopped and turned around. Dkt. No. 5-1 at 03:19. Deputy Williams, his hand still on Mullin's wrist, said to Mullins, "You're being detained . . . you['re] about to go in handcuffs." *Id*.; Dkt. No. 46-1 at 6:10-11. Mullins again pulled away and tensed his arm, in what Deputy Williams later called a "prefight indicator." Dkt. No. 11-2 at 3. Then, either Mullins pulled his arm away or Deputy Williams pulled Mullins' arm closer, or some combination thereof, and Deputy Williams used a "front leg sweep" to take Mullins to the ground. Dkt. Nos. 5-1 at 03:23 & 11-2 at 3. Mullins' face hit the ground, which drew blood and caused bruising about Mullins' nose, eyes, and cheeks. Dkt. Nos. 11-2 & 42, Illustrations H and I.

Mullins, now on his back, protested that he wasn't resisting; Deputy Williams responded that Mullins was resisting by using "passive resistance." Dkt. Nos. 46-1 at 6:18-21 & 11-2 at 3. On Deputy William's direction, Mullins then provided his hands and was handcuffed without further incident. Dkt. No. 11-2 at 3. Mullins provided his identification to Deputy Williams and was treated by EMS at the scene. *Id*.

---

[3] According to Deputy Williams's incident report, he grabbed Mullins just below the elbow in a technique called an "arm escort." Dkt. No. 11-2. However, Deputy Williams' body camera footage appears to show him grabbing Mullins' wrist. In any event, at the motion for summary judgment stage, the Court views the summary judgment evidence in the light most favorable to the nonmovant, Mullins. *Rosado v. Deters*, 5 F.3d 119, 123 (5th Cir. 1993).

With Mullins detained, Deputy Williams explained to Smith the reasons for Mullins' detention. He repeatedly emphasized that he had the right to identify individuals on the scene of a call. After Smith told Deputy Williams that Mullins hadn't done anything, Deputy Williams responded, "Yes, he did . . . I told him multiple times to stop. He attempted to walk away from me. I told him he was detained." Dkt. No. 46-1 at 7:24-8:7. Later, Smith again asked Deputy Williams what Mullins did; Deputy Williams told her that Mullins "didn't follow the lawful commands of a Texas peace officer." *Id*. at 10:25-11:1-2. Smith then provided background for her initial outcry, stating that "I had called because I'm a little suicidal . . . . So, [Mullins] was just trying to talk me out of being like that, you know . . . . He wasn't trying to hurt me." *Id*. at 11:16-25. Deputy Williams responded,

> I didn't say he was . . . . That happened because of his decisions . . . with me and him. It has nothing—absolutely nothing to do with you . . . I told him multiple times to stop. He refused. I told him he was detained and to turn around give me his hands. He refused. I laid hands on him, told him again; he refused.

*Id*. at 11:23-12:9. Deputy Williams later again told Smith, "I have every right to identify everybody on location to ensure that my safety, your safety, and everything that's going on around me . . . . He was refusing to identify. Are we on the same page?" *Id*. at 12:17-25.

Deputy Williams also explained things to Mullins. In a subsequent conversation on-scene, Deputy Williams emphasized to Mullins his right to obtain identification, stating, "[W]hen I do arrive . . . and I['ve] got multiple people on location, I do have the right as a Texas peace officer to identify everybody on location . . . . that's just straight up, okay? That's our standard policy. You've got to follow lawful commands." *Id*. at 25:9-19.

Deputy Williams released Mullins without further incident. *See* Dkt. No. 11-2. Throughout the encounter, Smith did not accuse Mullins of domestic violence, nor did Mullins admit to any wrongdoing. *See generally* Dkt. Nos. 11-2 & 46-1.

At the time of this incident, the Medina County Sheriff's Department had a formal, written policy addressing the identification of individuals at the scene of a call. All deputies received training on the policy. Medina County Sheriff's Office Policy 4.07 addressed how deputies should conduct field interviews and searches, and reads in pertinent part,

> 4. Officers will confine their questions to those concerning individual identity, place of residence, and other inquiries necessary to resolve the officer's suspicions. Officers will not detain individual(s) longer than reasonably necessary to resolve outstanding issues.
>
> 5. Officers are not required to give Constitutional rights and warnings (Miranda and/or juvenile) in order to conduct field interviews, unless there is probable cause to believe the person is considered a suspect of a specific crime, and the individual is not free to leave the presence of the officer. If and when the individual becomes a suspect and the officer decides that the individual may not leave, the officer will read all required warnings to the suspect(s), and provide those rights unless specifically waived by the suspect(s).
>
> 6. Stopped individuals <u>are not</u> required to answer any questions posed during field interviews. Failure to respond to an officer's inquiries is not sufficient grounds for arrest, or to stop the individual(s) from leaving. Likewise, individuals are not required to stay in the presence of an officer unless they are suspects, and you advise them that they are not free to go. Such refusal may be sufficient justification for additional observation and investigation.

Dkt. No. 67-2 at 3.

On December 29, 2021, Mullins filed this lawsuit listing Medina County and Deputy Williams as defendants, seeking relief through 28 U.S.C. § 1983 for violations of his constitutional rights. Dkt. No. 1. In Mullins' live complaint, he identifies seven other calls to which the Medina County Sheriff's Office responded and during which its deputies identified individuals on scene "irrespective as to whether the subject was in any way involved . . . or connected to the nature of the call." *See* Dkt. No. 42 at ¶¶ 97-103.[4]

---

[4] The live complaint twice names the Plaintiff as "Mr. Chappell." Dkt. No. 42 at ¶¶ 48, 62. The Court reads these as a scrivener's error based on context.

As part of this litigation, Deputy Williams' supervisor, Sheriff Randy Brown, sat for a deposition. In the deposition, Sheriff Brown stated that the District Attorney had a policy requiring that "if you're on camera [at the scene of a call], you're going to be identified." Dkt. No. 67-1 (deposition of Sheriff Randy Brown) at 29:7-10. Further, when asked if it's the "office's standard policy to identify everybody on scene," Sheriff Brown stated, "Yes, that would be [standard]" and "[w]e do it every day, all day long." *Id*. at 48:11-22. When asked specifically if Mullins was detained because he refused to identify himself, Sheriff Brown responded, "he should have gave [sic] his name, he's part of why we were there." *Id*. at 55:8-13. Sheriff Brown explained that based on the bodycam footage, Mullins was detained "[f]or interfering in the investigation . . . . [Where] the deputy was trying to gather enough information to know what happened" and that Deputy Williams did not violate Sheriff Department policy by conducing the detention. Id. at 66:22-67:6.

Defendants subsequently filed a Motion to Dismiss, Dkt. No. 43, which the District Court granted as to claims against Deputy Williams on qualified-immunity grounds and denied as to any *Monell* claims against the County. Dkt. Nos. 54 & 64. Medina County, now the sole defendant, then filed the present Motion for Summary Judgment, Dkt. No. 67. Mullins filed his response. Dkt. No. 70; *see also* Dkt. No. 71 (reply).

## Legal Standards

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also* Fed. R. Civ. P.

56(c). A fact dispute is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

The party moving for summary judgment bears the initial burden of "informing the district court of the basis for its motion[] and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. Once the movant carries its burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986); *Wise v. E.I. Dupont de Nemours & Co*., 58 F.3d 193, 195 (5th Cir. 1995). In carrying its burden, the nonmovant must respond to the motion by setting forth particular facts reflecting a genuine issue for trial. *Miss. River Basin Alliance v. Westphal*, 230 F.3d 170, 174 (5th Cir. 2000). The parties may satisfy their respective burdens by tendering depositions, affidavits, and other competent summary judgment evidence. *Topalian v. Ehrman*, 954 F.2d 1125, 1131 (5th Cir. 1992). The Court views the summary judgment evidence in the light most favorable to the nonmovant. *Rosado*, 5 F.3d at 123. On summary judgment, the Court considers evidence admissible at trial or that could be presented in a form that would be admissible at a trial. *See* Fed. R. Civ. P. 56(c)(2).

"After the non-movant has been given the opportunity to raise a genuine factual issue, if no reasonable juror could find for the non-movant, summary judgment will be granted." *Westphal*, 230 F.3d at 174. If, however, the party moving for summary judgment fails to satisfy its initial burden, the motion must be denied, regardless of the nonmovant's response. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc).

## Analysis

Defendant Median County's Motion for Summary Judgment should be denied. Triable fact issues prevent the grant of summary judgment for the County on the grounds urged in its motion. As this Court previously discussed in its prior Report and Recommendation, Dkt. No. 54, a county cannot be held liable for constitutional violations on claims brought via 28 U.S.C. § 1983 under a theory of respondeat superior. *See Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658, 690, 694 (1978); *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 403, (1997). Instead, a plaintiff must establish liability against a county by first identifying an official county policy and a policymaker, and then by showing that the policy was the "moving force" behind the alleged constitutional violation. *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (citing *Monell*, 436 U.S. at 694). The County's summary judgment motion fails because there are triable issues regarding whether Medina County had an official policy and whether that policy was the moving force behind the alleged violation of Mullins' constitutional rights.

### A.    There is a triable issue as to whether there was an unconstitutional policy.

An "official policy" need not be a formal written policy; it can instead be a custom embodied by "a persistent, widespread practice of . . . officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents . . . policy." *Piotrowski*, 237 F.3d at 579 (internal citations omitted). Here, there no longer appears to be a dispute that a *formal* Medina County Sheriff's Office policy directs "[d]eputies to attempt to identify individuals when investigating calls for service." Dkt. No. 71 at 2. This formal policy, urges the County, does not authorize deputies to *require* identification without sufficient cause:

> Stopped individuals are not required to answer any questions posed during field interviews. Failure to respond to an officer's inquiries is not sufficient grounds for arrest, or to stop the individual(s) from leaving. Likewise, individuals <u>are not</u> required to stay in the presence of an officer unless they are suspects, and you advise them that they are not free to go.

Dkt. No. 71 at 2 & n.2 (quoting Medina County Sheriff's Office Policy 4.07).

But a second, *unwritten* policy is also at issue; as Plaintiff Mullins sees it, the formal written policy identified by the County is a "red herring," Dkt. No. 70 at 7. According to Mullins, the District Attorney is the driving force behind this second policy. This unwritten policy, adopted by the Sheriff's Department at the Sheriff's direction, says Mullins, requires identification of "all persons at the scene." *Id*. at 4; *see* Dkt. No. 67 at 6 ("The District Attorney also requires the Sheriff's Department to identify everyone at the scene of a call." (citing Dkt. No. 67-1 at 29:4-16)). Sheriff Brown described this policy as follows:

> Q    Okay. Now, in particular, what is your office's policy on deputies having to identify everyone on scene if they come to a scene?

> A    Well, it's not just policy, it's our DA. So if you're on camera, you're going to be – you're going to be identified. So that's per our district attorney. So it depends on the scene. So I can't just make up -- make up a scene in my head and tell you, yeah, that's what we're going to do. It depends on what, you know, I got to have more -- more to say. Yeah. We're going to identify everybody there or no, we're not or we're going to attempt to -- and some are going to leave.

Dkt. No. 67-1 at 29:4-16. It is on this alleged second, unwritten policy that the Court now focuses.

There is sufficient evidence of an unwritten, unconstitutional policy to warrant denial of summary judgment on the County's argument that no such policy is implicated here. Evidence supporting the existence of an unwritten policy—adopted by the Sheriff's Department decisionmaker at the District Attorney's direction—is present. First Deputy Williams' bodycam video in which Deputy Williams tells Mullins,

> *No matter what it is*; but when I do arrive, okay, and I got multiple people
> on location, I do *have the right as a Texas peace officer to identify everybody* on
> location.
>     . . . .
>     Okay? So, I mean, that's just straight up, okay? *That's our standard*
> *policy*. . . .

Dkt. No.46-1 at 25:9-16) (emphasis added); Dkt. No. 11-2 (report) at 3 ("I repeated my request

for [Mullins'] identification, advising him I had the right to identify all persons on a location that

I had been called to in the commission of my duties."); *see also* Dkt. No. 5-1. For its part, the

County acknowledges that "[t]he District Attorney also requires the Sheriff's Department to

identify everyone at the scene of a call." Dkt. No. 67. The County, however, appears to treat this

instruction from the District Attorney as through it were consistent with the official written

policy above. *See generally id.* at 5-8.

        Confirming that a triable issue of fact is presented on the presence of a policy mandated

by the District Attorney and promulgated by the policymaker—the Sheriff himself—is a second

piece of evidence: the deposition testimony of Sheriff Brown. Brown testified that "it's not just

policy, it's our [District Attorney]. So if you're on camera, you're going to be - - you're going to

be identified . . . . [T]hat's per our district attorney." Dkt. No. 67-1 at 29:7-9. Additional

questioning at the deposition reinforces the point:

>     Q    Okay. But what if that person, Sheriff, is there and you haven't
> determined whether they're involved? Do they have a legal duty to identify
> themselves to you?
>     . . . .
>     Q    [D]oes the person you're trying to identify have a duty to identify
> themselves to you if you ask them to?
>     A    Yes.
>     Q    Okay. What basis do you know that to come from? What . . .
> requires them under the law to do that?
>     A    Because . . . you are there . . . . So you don't know what's going on
> . . . . you don't know if a person is part of the problem, not part of the problem,
> you're doing an investigation. And in that investigation, *you identify everyone*
> *that may have been involved in whatever it is* . . . .

10

*Id*. at 30:2-24 (emphasis added). This testimony directly reflects the view of the policymaker, Sheriff Brown, that the County's unwritten policy *requires* all people at the scene of an investigation to identify themselves, even if they are not under suspicion and, in particular, if they are merely "on camera" for any reason whatsoever. *Id*. at 29:8. In short, there is a triable issue of fact concerning the County's policy.

There is no dispute here that Mullins has identified a policymaker, the Sheriff. The County takes issue instead with Mullins invoking the District Attorney as the source of the policy. On the County's reading, "a policy of the District Attorney's office . . . is not a [c]ounty policy" because "the District Attorney is a separate elected office and . . . [here] has jurisdiction over three separate [c]ounties." Dkt. No. 71 at ¶ 5. But it is entirely plausible—and there is ample evidence in the above-discussed Sheriff's testimony to suggest—that the District Attorney cajoled or convinced the Sheriff to adopt a policy requiring identification of all individuals at a scene, and that the Sheriff in fact imposed that policy. The Court need not look to other alleged incidents to infer the existence of the policy because there is already a triable issue based on the Deputy's and the Sheriff's statements. This is not a case where a string of similar incidents is needed to establish the existence of an unwritten policy; evidence of the policy comes directly from the Deputy's and, most significantly, the policymaker's own statements.

**B.    There is a Triable Issue as to Whether an Official Policy was the Moving Force Behind a Constitutional Violation.**

To show that the policy in question was a moving force behind a constitutional violation, a plaintiff must establish either that the policy was unconstitutional on its face or that it was "a facially innocuous policy . . . promulgated with deliberate indifference to the known or obvious consequences that constitutional violations would result." *Piotrowski*, 237 F.3d at 579 (internal quotation marks omitted); *Liggins v. Duncanville*, 52 F.4th 953, 955 (5th Cir. 2022).

The County's Motion unjustifiably assumes that this case is about a facially innocuous policy, namely Medina County Sheriff's Office Policy 4.07, such that the Court must focus on deliberate indifference. The County thus frames the case as involving *only* an application of its formal written policy that does not *require* identification but merely *encourages* it. *See* Dkt. No. 67 at ¶ 31. But that framing is question begging. There is a triable issue of fact concerning whether there was an unwritten policy—which testimony from both Deputy Williams and Sheriff Brown supports—that *required* the identification of everyone at a scene regardless of any reasonable suspicion or probable cause. *See, e.g.*, Dkt. No. 67-1 at 29:8.

Such a policy mandating identification of all persons regardless of reasonable suspicion or probable cause would likely be unconstitutional, and the County does not, on the Court's reading of the County's Motion, argue otherwise. Indeed, police are generally permitted to ask questions of people not suspected of a crime, including asking for identification, but only "as long as the police do not convey a message that compliance with their request is required." *Florida v. Bostick*, 501 U.S. 429, 435 (1991). The Supreme Court's opinion in *Brown v. Texas* is instructive:

> The Texas statute under which appellant was stopped and required to identify himself is designed to advance a weighty social objective in large metropolitan centers: prevention of crime. *But even assuming that purpose is served to some degree by stopping and demanding identification from an individual without any specific basis for believing he is involved in criminal activity, the guarantees of the Fourth Amendment do not allow it.* When such a stop is not based on objective criteria, the risk of arbitrary and abusive police practices exceeds tolerable limits.

*Brown v. Tex.*, 443 U.S. 47, 52 (1979) (emphasis added); *cf. id*. at 53, n.3 (distinguishing a situation when a refusal to identify occurs during a "lawful investigatory stop" supported by reasonable suspicion). The Court, therefore, need not address deliberate indifference; there is a triable fact question concerning whether Mullins was the victim of a facially unconstitutional

policy. *See Monell*, 436 U.S. at 690-91 (noting, "local governments, like every other § 1983 'person,' . . . may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval").

If it turns out at trial that no County policy required identification of everyone at every scene, no matter what, then Mullins would likely need to show deliberate indifference. And that would be a tall order, at least based on the present record. The issue could then be addressed by a motion for judgment as a matter of law. But summary judgment is not warranted because there is at least one disputed fact issue concerning the County's policy.

### Conclusion and Recommendation

For the reasons discussed above, it is recommended that Defendant Medina County's Motion for Summary Judgement, Dkt. No. 67, should be **DISMISSED**.

Having considered and acted upon all matters for which the above-entitled and numbered case was referred, it is **ORDERED** that the above-entitled and numbered case is **RETURNED** to the District Court for all purposes.

### Instructions for Service and Notice of Right to Object/Appeal

The United States District Clerk shall serve a copy of this report and recommendation on all parties by either (1) electronic transmittal to all parties represented by attorneys registered as a "filing user" with the clerk of court, or (2) by mailing a copy by certified mail, return receipt requested, to those not registered. Written objections to this report and recommendation must be filed **within fourteen (14) days** after being served with a copy of same, unless this time period is modified by the district court. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Objections, responses, and replies must comply with the same page limits as other filings, unless otherwise excused by the district court's standing orders. *See* Rule CV-7. The objecting party shall file the

objections with the clerk of the court and serve the objections on all other parties. A party filing objections must specifically identify those findings, conclusions, or recommendations to which objections are being made and the basis for such objections; the district court need not consider frivolous, conclusory, or general objections. A party's failure to file written objections to the proposed findings, conclusions, and recommendations contained in this report shall bar the party from a *de novo* determination by the district court. *Thomas v. Arn*, 474 U.S. 140, 149-52 (1985); *Acuña v. Brown & Root*, *Inc.,* 200 F.3d 335, 340 (5th Cir. 2000). Additionally, failure to timely file written objections to the proposed findings, conclusions, and recommendations contained in this report and recommendation shall bar the aggrieved party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

**IT IS SO ORDERED**.

SIGNED this 30th day of August, 2024.

RICHARD B. FARRER
UNITED STATES MAGISTRATE JUDGE